IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| SUPER LEGIT, LLC; | ) | |
| ANDREW LUHRING, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No.  1:19-cv-5603 |
| | ) | |
| PULLMAN PORTER LLC; and | ) | |
| LEVAR HOARD, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiffs, Super Legit, LLC ("Super Legit") and Andrew Luhring ("Luhring") (collectively, "Plaintiffs"), through counsel, complain against Defendants, Pullman Porter, LLC ("Pullman") and Levar Hoard ("Hoard") (collectively "Defendants"), as follows:

## STATEMENT OF THE CASE

1.      This action arose from Pullman and/or Hoard's improper business dealings in connection with an event organized by Super Legit, and Pullman and/or Hoard's subsequent detrimental actions to the Plaintiffs, which include Pullman and/or Hoard's publishing of material owned by Super Legit and Hoard's publishing of false statements about Luhring. This action includes claims for: (I) copyright infringement; (II) defamation *per se*; (III) defamation; and (IV) breach of contract.

## PARTIES

2.      At all relevant times, Super Legit, LLC was a limited liability company organized under the laws of Illinois.

3.     Luhring is an individual and at all relevant times was a resident of Cook County, Illinois.

4.     Hoard is an individual and on information and belief at all relevant times was a resident of Cook County, Illinois.

5.     At all relevant times, Pullman Porter, LLC was a limited liability company organized under the law of Illinois.

## JURISDICITION AND VENUE

6.     This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a) as this case arises under the Copyright Act of 1976, 17 U.S.C. § 101 *et seq*. This court has supplemental jurisdiction to hear Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

7.     This Court has personal jurisdiction over Defendants in that Hoard, an individual, on information and belief resides in Cook County, Illinois; Pullman, a limited liability company, is organized under the laws of Illinois; and Defendants have targeted Illinois citizens with the infringing electronic documents complained of herein. Having targeted and disseminated infringing materials to Illinois citizens, Defendants could reasonably be expected to be required to answer for the contents of such materials in Illinois.

8.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 in that Defendants are subject to the Court's personal jurisdiction in this District with respect to the civil action in question.

## FACTS

### Super Legit and the Business of Event Organizing

9.     Super Legit is primarily an event organizer among its various other music-related ventures.

10.     Luhring is the owner and manager of Super Legit.

11.     Super Legit differentiates itself from its competitors through the legitimacy of its events and consequently its positive relationship with the local community. Obtaining the proper permits and licenses for events that its hosts is important to its business model and reputation. Also, because it earns revenue from ticket sales, the quality of its events and the experiences that its guests have is of great importance to its operations including the public's perception of its events.

12.     In or around early 2019, Super Legit was planning an event called "Black Market" scheduled for April 13, 2019 ("Black Market Event"). Super Legit was organizing the Black Market Event for reasons including but not limited to: (1) launch the Super Legit brand; and (2) launch the record of Super Legit's first signed artist. The event was named "Black Market" because the artist's record was called "The Black/White EP," and the event was to include a market where artists could sell black and white themed artwork.

13.     In or around early 2019, Super Legit was seeking a venue for the Black Market Event. Super Legit was seeking to rent out a venue only through means consistent with its core mission. Super Legit was seeking to rent an unused or underutilized building whose owner would be open to the opportunity to receive revenue from a one-off event.

<u>**Super Legit Meets Hoard and Rents a Venue**</u>

14.     In or around late February or early March of 2019, Luhring met Hoard.

15.     On information and belief, Hoard is a local artist and has painted murals and/or coordinated the painting of murals around the City of Chicago.

16.     On information and belief, Hoard has acted as a liaison between venue owners and other event organizers.

3

17.     In or around late February or early March of 2019, Hoard told Luhring and/or Super Legit that a series of murals that were on Hubbard street in the West Loop of Chicago was part of a project called the B_Line project ("B_Line project").

18.     In or around late February or early March of 2019, Hoard told Luhring and/or Super Legit that Hoard was "the" person who ran the alleged B_Line project; and/or Hoard otherwise represented himself as an agent of the alleged B_Line project capable of making decisions concerning it.

19.     In or around late February or early March of 2019, Hoard told Luhring and/or Super Legit that the alleged B_Line project operates spaces including spaces associated directly with the murals and buildings in the nearby areas ("alleged B_Line spaces"); and/or Hoard otherwise represented that the alleged B_Line spaces exist, and that Hoard was as an agent of the alleged B_Line spaces and that he was capable of making decisions concerning them.

20.     In or around late February or early March of 2019, Hoard told Luhring and/or Super Legit that the alleged B_Line spaces could be used for the Black Market Event. Further, Hoard represented that the alleged B_Line spaces were available for rent through him.

21.     On information and belief, there is a venue space commonly known as "The Knuckle." The Knuckle is a tunnel and/or viaduct under the Union-Pacific-owned train tracks where there is a large mural memorializing Frankie Knuckles as the godfather of Chicago House music ("The Knuckle"). The Knuckle is an outdoor space.

22.     In or around late February or early March of 2019, Hoard represented to Luhring and/or Super Legit that "The Knuckle" is one of the alleged B_Line spaces.

23.     In or around late February or early March of 2019, Hoard and Super Legit entered into an oral agreement for Super Legit's rental and/or utilization of The Knuckle as the venue for the Black Market Event.

24.     Hoard's role was to act as the liaison between the venue owner and Super Legit. It was agreed as follows: (1) Hoard charged Super Legit $650 to fund the creation of 2 murals in exchange for The Black Market Event's usage of The Knuckle; (2) Hoard otherwise "waived" the "fee" to use the space; (3) Hoard told Luhring and/or Super Legit that Hoard would obtain all the required permits, contracts, and/or licenses; and (4) Hoard required that Super Legit obtain insurance for the Black Market Event and list six entities as insureds, including but not limited to: the City of Chicago, Union Pacific, and "B_Line / Pullman."

25.     Although Hoard said "B_Line / Pullman," it is unclear to Plaintiffs: (1) what exact legal entity "B_Line / Pullman" refers to, if any; (2) how exactly "B_Line" is associated with Pullman, if at all; (3) whether any legal entity related to the "B_Line" exists; and (4) if Hoard and/or Pullman has any right to manage, license, and/or use the "B_Line spaces".

26.     On information and belief, at all relevant times Hoard acted individually and/or as an agent for Pullman.

27.     In or around late February or early March of 2019, Super Legit obtained an insurance policy for the Black Market Event pursuant to Hoard's direction.

28.     On or about April 4, 2019, Luhring sent Hoard a written contract to memorialize their oral agreement for Super Legit's usage of The Knuckle for the Black Market Event.

29.     On or about April 10, 2019, Hoard informed Super Legit that he refused to sign Super Legit's proposed contract.

30. On or about April 11, 2019, Hoard sent Super Legit a different contract called the "Event License Agreement" that Hoard drafted ("Hoard Contract"). Exhibit 1.

31. Hoard required Super Legit to sign the Hoard Contract in order to use the space. The event was scheduled for 2 days after Hoard sent Super Legit the Hoard Contract.

32. On or about April 12, 2019, Luhring signed the Hoard Contract on behalf of Super Legit.

33. The Hoard Contract states that it is "by and between" "Super Legit LLC for its event titled "Black Market" and "Pullman Porter LLC and/or Levar Hoard as Administrator and Custodian of the corridor known as The B_Line in Chicago's Fulton Market District." Exhibit 1.

34. As memorialized in the Hoard Contract, it involved a "popup market event with music." Exhibit 1. Integral to the Black Market Event was the popup market.

35. On or about April 11, 2019, Hoard informed Luhring and Super Legit that Hoard did not obtain a pop-up license which was a requirement to sell merchandise at the Black Market Event. Again, the event was scheduled for two days later.

36. On information and belief, Hoard never obtained the pop-up license for the Black Market Event.

**After the Event, Hoard Publishes Super Legit's Photos and Videos**

37. During the Black Market Event, Super Legit created photographs and videos of the Black Market Event for use in the course of Super Legit's business, including but not limited to promotional purposes.

38. Super Legit commissioned and/or contracted for the creation of photographs and videos of the Black Market Event, including but not limited to the payment of $2,000 for the creation of an event recap video.

6

39.     Super Legit is the sole owner of the event recap video that it created ("Super Legit Video") of the Black Market Event.

40.     On information and belief, Hoard downloaded the Super Legit Video, modified it to replace Super Legit branding with B_Line branding ("Adulterated Super Legit Video"), without Super Legit's permission and then published it on the internet to promote his own interests.

41.     On or about May 22, 2019, Hoard was put on notice of his infringement of Super Legit's copyright and demand was made that Hoard remove the Adulterated Super Legit Video.

42.     Further, On or about May 22, 2019, Hoard refused to remove the Adulterated Super Legit Video from his social media platform(s), including but not limited to his Instagram feed, Instagram Story, Facebook, and/or other websites under his possession and/or control.

**Uncovering Potentially Contradictory Information to Hoard's Representations**

43.     On or about May 23, 2019, Luhring and/or Super Legit called the office of the City of Chicago Alderman Scott Waguespack ("Waguespack's office") to inquire as to Hoard's relationship with the City of Chicago. Waguespack's office told Luhring and/or Super Legit that the results of their employee search and contract search reported that: (1) Hoard was not an employee of the City of Chicago, and (2) neither Hoard, Pullman, and/or the B_Line had a contract with the City of Chicago.

44.     On information and belief, Union Pacific is the owner of the viaduct/railroad where the Knuckle is located.

45.     Again, on or about May 23, 2019, Luhring called Union Pacific and on information and belief he spoke with a Union Pacific agent in charge of public affairs and community relations to inquire as to Union Pacific's relationship with Hoard, Pullman, and/or

the B_Line. The Union Pacific agent told Luhring that he was unaware of any new murals being painted, that he had never heard of the B_Line, and that the murals and/or works presented on Union Pacific property were considered public art and could be freely filmed.

46.     On information and belief, Hoard never obtained the proper contracts and/or permits and/or licenses for the Black Market Event for The Knuckle, from its owners, and/or the City of Chicago.

## Further Issues with the Super Legit Video

47.     On or about May 30, 2019, the Super Legit Video was posted on Super Legit's social media channels.

48.     On or about May 31, 2019, Luhring and/or Super Legit became aware that the Adulterated Super Legit Video was still posted on Hoard's Facebook page.

49.     On or about May 31, 2019, Luhring and/or Super Legit filed a DMCA takedown request with Facebook (reference number 2006047152837256). Soon thereafter, on information and belief, Facebook removed the Adulterated Super Legit Video from Hoard's Facebook page.

## Hoard's Statements about Super Legit

50.     On or about June 1, 2019, Hoard began making false, threatening, harassing and/or disparaging statements, both orally and via internet publication about Luhring and/or Super Legit.

51.     Hoard published false statements about Luhring and/or Super Legit on Facebook, including but not limited to:

    a.      "I launched his motherf###ing new 'career' and 'project' on my watch and my dime" Exhibit 2;

8

    b.    "This a##hole is fake and showed his fakeness when he called the cops on me randomly and told them false information and tried to convince them that I didn't have the rights to The B_Line and was some kinda 'black bum' hustling folks for bus fare or squares" <u>Exhibit 2</u>;

    c.    "He went postal and created a whole elaborate, fake ass story to tell the cops" <u>Exhibit 2</u>;

    d.    "sugar-daddy having a##" <u>Exhibit 2</u>;

    e.    "[he] took allllll [sic] the credit for the event I hand-delivered to him (that wouldn't have happened at all without my production effort and investment and network and project)" <u>Exhibit 2</u>; and

    f.    "his false and vindictive narrative rooted in his mental issues" <u>Exhibit 2</u>.

52.    Hoard published threatening statements about Luhring and/or Super Legit on Facebook, including but not limited to:

    a.    "B####...I will eviscerate you publicly . . ." <u>Exhibit 2</u>;

    b.    "but don't you dare be a punk a## b#### like this motherf###er. It will be game over for you hun – I've had it with Chicago's lame midwestern energy that seems to manifest itself like this from time to time – particularly with repressed, entitled white homos like this c###sucker" <u>Exhibit 2</u>;

    c.    "Hunny, I'll leave you with your pancreas on the concrete" <u>Exhibit 2</u>;

    d.    "But he most certainly will get my response and be dragged into the daylight from the deep shadows of his petty a## personality. Don't f###

with your elders son. Or do, and prepare for the consequences…" <u>Exhibit 2</u>;

e.     "summon the n##### in me – I dare anyone. But I don't use guns, I use this deadly brain" <u>Exhibit 2</u>;

f.     "he will own the consequences" <u>Exhibit 2</u>; and

g.     "If you think you can cause all this bullshit and bring me all this drama, you're sorely mistaken. I will defend what I created and loaned to you" <u>Exhibit 2</u>.

53.     Hoard published harassing statements about Luhring and/or Super Legit, including but not limited to:

a.     "this motherf###er – with all his mental ass issues" <u>Exhibit 2</u>;

b.     "The motherf###ing nerve of this a##hole" <u>Exhibit 2</u>;

c.     "This a##hole is fake" <u>Exhibit 2</u>;

d.     "don't you dare be a punk a## b#### like this motherf###er" <u>Exhibit 2</u>;

e.     "You f###ing pissant" <u>Exhibit 2</u>;

f.     "His p#### stank – he catfishing" <u>Exhibit 2</u>; and

g.     "before your young, inexperienced a## think [sic] you're going to f### me" <u>Exhibit 2</u>.

54.     Hoard disparaged the services and/or the Super legit business by false and/or misleading representation of fact, including but not limited to attaching the following statements:

a.     "Do not ever deal with this a##hole" <u>Exhibit 2</u>;

b.     "I will warn my friends to stay away from you hunny" <u>Exhibit 2</u>; and

c.     "must be sucking that old a## di## to get that money punk" <u>Exhibit 2</u>.

55. Super Legit and/or Luhring have suffered as a result of Hoard's false statements, including but not limited to the following ways: (1) a damaged reputation; (2) financial harm due to damaged reputation; and (3) difficulty finding venues for future events due to a damaged reputation.

## COUNT I

### (COPYRIGHT INFRINGEMENT)

56. Super Legit repeats and realleges paragraphs 1-55 herein.

57. Copyright protection exists in original photographs and videos. 17 U.S.C. § 102(a). The copyright owner has the exclusive right to display the copyrighted work publicly, or to authorize such, and to prepare derivative works based upon the copyrighted work. § 106. If anyone violates any of these exclusive rights, then they are an "infringer of the copyright," and an action may be brought against them. § 501.

58. Super Legit is engaged in the business of organizing events. Super Legit's high-quality, professional photographs and videos of the events it organizes are highly sought after and Super Legit is routinely engaged in promoting its events and otherwise conducting its business through its photographs and videos. Super Legit's photographs and videos are scarce.

59. Super Legit has at all times been the exclusive owner of all right, title, and interest in the Super Legit Video.

60. Super Legit is the exclusive owner of the following U.S. Copyright Registration Number, copies of which are attached hereto as Exhibit 3:

  a.   PA 2-192-440.

61. Super Legit's copyright is valid and subsisting.

62.     Neither Hoard or Pullman were granted a license to use, copy, distribute, or make any derivative of the Super Legit Video.

63.     On information and belief, Hoard and/or Pullman's businesses are engaged in promoting the use of the alleged B_Line project and/or the alleged B_Line spaces, and/or Hoard and/or Pullman's businesses otherwise receive tangible or intangible benefits from such promotion.

64.     Hoard and/or Pullman has used the Super Legit Video, and/or the Adulterated Super Legit Video on its website(s) and/or social media platforms.

65.     By posting the Super Legit Video and/or the Adulterated Super Legit Video all over the internet, Hoard and/or Pullman displayed Super Legit's copyrighted work publicly.

66.     Hoard and/or Pullman have infringed on Super Legit's copyrights by impermissibly copying and distributing the Super Legit Video, and by disseminating the Adulterated Super Legit Video. Such conduct represents multiple and ongoing infringements of Super Legit's valid copyright.

67.     Upon discovering Hoard and/or Pullman's unauthorized use of the Super Legit Video and/or publication of the Adulterated Super Legit Video. Super Legit notified Hoard and/or Pullman of its copyright infringement and demanded that Hoard and/or Pullman remove the infringing materials and cease its infringement.

68.     Hoard and/or Pullman refused to seize their infringing activities and continue to infringe upon Super Legit's valuable copyright.

69.     The natural, probable, and foreseeable result of Hoard and/or Pullman's wrongful conduct has been and continues to be to injure Super Legit's relationships with present and prospective customers, partners, associates, and/or otherwise deprive Super Legit of the benefits

of the Super Legit Video. Super Legit has lost and will continue to lose substantial revenue from Defendants' wrongful use, copying, and distribution of the Super Legit Video, and/or the publication of the Adulterated Super Legit Video. Hoard and/or Pullman's wrongful conduct has deprived and will continue to deprive Super Legit of opportunities for expanding the goodwill associated with its business.

70.     Super Legit is entitled to recover damages that it has sustained and will continue to sustain, together with any gains, profits, and/or advantages obtained by Hoard and/or Pullman as a result of their infringement, along with prejudgment interest, attorney's fees, and costs.

71.     At present, the amount of such damages, gains, profits, and/or advantages cannot be fully ascertained by Super Legit but are believed to be not less than $80,000.00 ($65,000.00 in good will and $15,00.00 in costs).

72.     The harm caused to Super Legit has been irreparable.

WHEREFORE, Super Legit requests that the Court enter judgment in its favor and against Defendants as follows:

> A.     Preliminarily and permanently enjoin and restrain Defendants, its officers, directors, principals, agents, servants, employees, successors, assigns, and all those in active concert or participation with the from (a) imitating, copying, distributing or making unauthorized use of Super Legit's registered copyright, including the infringing uses of the Super Legit Video as complained of herein; and (b) manufacturing, creating, producing, advertising, promoting, or displaying any products, displays, or advertisements bearing any simulation, reproduction, counterfeit, copy,

derivative version, or colorable imitation of Super Legit's copyrighted content;

B.   Direct that Defendants deliver for destruction at Defendants' expense, *inter alia*, all copies of infringing worked identified herein that bear or were created through the unauthorized use of the Super Legit Videos or a derivative version thereof, together with any and all computer files, hard drives, computer programs, solid state drives, disks, CD-ROMs and DVDs bearing unauthorized, derivative and/or infringing copies, as well as any and all other recorded media, graphical representations, displays on the Internet, marketing materials and merchandise in Defendants' possession or under its control that were created or that bear the result of the unauthorized use of the Super Legit Video;

C.   Direct that Defendants be required to pay Super Legit for its actual damages along with disgorgement of all gains, profits, and advantages derived by Defendants through its unauthorized uses of Super Legit's copyright together with prejudgment interest;

D.   Direct that Defendants be required to pay to Super Legit such other damages that it has sustained as a consequence of Defendants' unauthorized use of Super Legit's copyright;

E.   Direct that Defendants be ordered to make a written report within a reasonable period of time to be filed with the Court detailing the manner of compliance with the requested injunctive and mandatory relief above;

F.     Award Super Legit the costs of this action together with prejudgment interest, reasonable costs, and attorneys' fees; and

G.     Award any other relief that the Court deems just and proper.

## COUNT II

## (DEFAMATION *PER SE* TO LUHRING)

73.     Luhring repeats and realleges paragraphs 1-72 herein.

74.     Hoard published on Facebook the following false statements about Luhring that impute Luhring is unable to perform and/or lacks integrity in performing his employment duties:

a.     "I launched his motherf###ing new 'career' and 'project' on my watch and my dime," Exhibit 2; and

b.     "[he] took allllll [sic] the credit for the event I hand-delivered to him (that wouldn't have happened at all without my production effort and investment and network and project)" Exhibit 2.

75.     Hoard published on Facebook the following false statements about Luhring that impute Luhring lacks ability or otherwise prejudices that person in his profession:

a.     "I launched his motherf###ing new 'career' and 'project' on my watch and my dime"; Exhibit 2. and

b.     "[he] took allllll [sic] the credit for the event I hand-delivered to him (that wouldn't have happened at all without my production effort and investment and network and project)". Exhibit 2.

76.     Hoard published to Facebook the following false statements about Luhring that impute Luhring has engaged in fornication:

a.     "sugar-daddy having a##"; Exhibit 2. and

    b.    "must-be-sucking-that-old-a##-d###-to-get-that-money punk". <u>Exhibit 2</u>.

77.    Hoard's statements about Luhring constitute defamation *per se*.

WHEREFORE, Luhring requests that the Court enter judgment in his favor and against Hoard as follows:

    A.    Award Luhring damages in an amount to be proven at trial;

    B.    Enjoin Hoard permanently from repeating the defamatory statements to third parties and/or otherwise award Luhring injunctive relief; and

    C.    Award Luhring any other relief that the Court deems just and proper.

## <u>COUNT III</u>

### (DEFAMATION TO LUHRING)

78.    Luhring repeats and realleges paragraphs 1-77 herein.

79.    Hoard made the following false statements about Luhring:

    a.    "I launched his motherf###ing new 'career' and 'project' on my watch and my dime"; <u>Exhibit 2</u>.

    b.    "This a##hole is fake and showed his fakeness when he called the cops on me randomly and told them false information and tried to convince them that I didn't have the rights to The B_Line and was some kinda 'black bum' hustling folks for bus fare or squares"; <u>Exhibit 2</u>.

    c.    "He went postal and created a whole elaborate, fake ass story to tell the cops"; <u>Exhibit 2.</u>

    d.    "sugar-daddy having a##"; <u>Exhibit 2</u>.

    e.    "must-be-sucking-that-old-a##-d###-to-get-that-money punk"; <u>Exhibit 2</u>.

      f.     "[he] took allllll [sic] the credit for the event I hand-delivered to him (that wouldn't have happened at all without my production effort and investment and network and project)"; <u>Exhibit 2</u>. and

      g.     "his false and vindictive narrative rooted in his mental issues". <u>Exhibit 2</u>.

80.     Hoard made these false statements about Luhring in an unprivileged publication to third parties by and through a Facebook post.

81.     The false statements that Hoard posted on Facebook caused Luhring to suffer damages including but not limited to the harm to Luhring's reputation in the community that Luhring has experienced and that he will continue to experience.

82.     Hoard knew or should have known that his statements were false when he made them and/or he acted with reckless disregard for whether the statements were true or false. Hoard acted with malice in a willful and wanton manner. As a result, Luhring is entitled to an award of punitive damages.

WHEREFORE, Luhring requests that the Court enter judgment in his favor and against Hoard as follows:

      A.     Award Luhring damages in an amount to be proven at trial;

      B.     Award Luhring punitive damages;

      C.     Award Luhring his costs;

      D.     Enjoin Hoard permanently from repeating the defamatory statements to third parties and/or otherwise award Luhring injunctive relief; and

      E.     Award Luhring any other relief that the Court deems just and proper.

## **COUNT IV**

### **(BREACH OF CONTRACT)**

17

83. Super Legit repeats and realleges paragraphs 1-82 herein.

84. The Hoard Contract entered between Super Legit and Pullman and/or Hoard is a valid and enforceable contract.

85. Super Legit performed all of its obligations under the contract.

86. Pullman and/or Hoard materially breached the contract with Super Legit including but not limited to by failing to obtain all of the permits, contracts, and/or licenses required for use of the Knuckle for the Black Market Event.

87. As a direct and proximate result of Pullman and/or Hoard's material breaches of the Hoard Contract, Super Legit was damaged in an amount to be proven at trial.

WHEREFORE, Super Legit requests that the Court enter judgment in its favor and against Defendants as follows:

    A.    Award actual damages that Super Legit suffered from Hoard's material breaches of the agreement, which are to be determined at trial;

    B.    Award Super Legit its attorney's fees and costs; and

    C.    Award Super Legit any other relief that the Court deems just and proper.


                SUPER LEGIT, LLC; and
                ANDREW LUHRING


              By:    /s/  James V. DiTommaso
                    One of their attorneys

Vincent L. DiTommaso (6181810)
James V. DiTommaso (6328466)
DiTommaso Law LLC
17W220 22nd Street, Suite 410
Oakbrook Terrace, IL 60181
(630) 333-0000
vdt@ditommasolaw.com
jvd@ditommasolaw.com
eservice@ditommasolaw.com

18

# EXHIBIT 1

DocuSign Envelope ID: 4E74E75B-8B08-41C7-B5D0-846B1695B2ED





**EVENT LICENSE AGREEMENT**

THIS AGREEMENT (the "Agreement"), made as of this **11 day of April, 2019** by and between **Super Legit LLC for its event titled "Black Market"** (the "User" or "Licensee"), and **"Pullman Porter LLC and/or Levar Hoard"** as Administrator and Custodian of the corridor known as **The B_Line** in Chicago's Fulton Market District (the "Licensor" and/or "Program Owner").

WHEREAS, the User wishes to use **the section of The B Line art corridor located at or near Hubbard and Green Streets having the approximate address 815 W Hubbard Street, Chicago, Illinois 60642** (The "Premises" or "Area" or "Space") to accommodate and support the User's event activities, equipment, staff, and guests for **a popup market event with music** (collectively the "Licensed Purpose" or "Event")**.** This agreement permits the User to use the Premises and Space to perform its Event activities under The Metropolitan Underpass and Railroad Art & Lighting (M.U.R.A.L.) program during the Usage Period only.

In consideration of the mutual promises and covenants contained herein, the Parties agree as follows:

1. Licensor hereby grants to User permission and temporary property access / usage rights (a "License") to use the following space: **the section of The B Line art corridor located at or near Hubbard and Green Streets in the mural area known as "The Knuckle" and its tunnels and walls thereabouts having the approximate address 815 W Hubbard Street, Chicago, Illinois 60642** (the "Space").

2. The Event requires access to the Space from April 13, 2019 from 8pm to Midnight or longer if permitted by law with load-in period beginning no earlier than noon April 13th and load out period no later than noon April 14 2019 (the "Usage Period"), and User shall have the right to enter the Space during this time only for setup / breakdown and event day activities. During the Usage Period the User may keep equipment, supplies, fixtures or other required materials on the Premises and will remove the same at the end of the Agreement. User is solely responsible for the security of its equipment and personnel both before and after the event and Licensor shall not be responsible for any loss, damage, theft, or harm of any persons or items on the Premises whatsoever unless caused by the Licensor's negligence or willful misconduct.

3. The Space shall be provided as-is and User shall leave the Space in the same or similar condition as when User entered. User shall be responsible for any damage caused to the Space beyond ordinary wear and tear, and shall be required to arrange for the repair of any such damage. User shall remove all trash and pay for any trash removal services before the usage period expires. In the event that trash or event debris remains, Licensor shall retain cleaning services and bill user for any fees incurred in removing same.

4. The payment of your Usage/licensing fee includes your use of the space and its walls for art and the Event Purpise. The event fee is to be paid as follows:

Licensing/Usage Fees, Base Facility Fees, and Additional Services:
Base Commercial Licensing & Usage Fee for B_Line program  $0 WAIVED

Additional fees: Murals: Licensor will engage 2-3 artists who have been approved by User ("Artists")
Artist commission fees, materials, ladders/scaffolding, embankment setup/prep (**two** artists, total) $TBD
to be sponsored or paid for by the User for the event or immediately thereafter within 7 days.




5. Guaranteed guest count (not to exceed 500 persons), final Event set up, food & beverage menu, Audio Visual/Technical and itinerary must be confirmed and provided to Licensor by User within fourteen (14) business days prior to the event. The Licensor does not accept responsibility for receiving or removing the property of the User, or the User's guests and will not provide any services in connection with deliveries and pickups. Only music and lyrics suitable for a public place will be allowed and its volume is subject to control by the Licensor and/or police at any time during the Usage Period. Decorations must be free-standing and not attached to the train superstructure/ceilings/girders, columns, or trusses. No open candle flames are allowed. All food and beverage providers, caterers, and vendors must be licensed and approved by Licensor and a copy of their licenses must be provided prior to the Event.

6. User plans to advertise and promote the Event and accordingly User and Licensor shall have the right to create videos, photographs, recordings, or otherwise document the User's Event (including the Premises and Space) for the purposes of promoting the B_Line project. This right extends to all media whether now known or hereafter discovered including without limitation, broadcast media, outdoor media, point of purchase, online broadcasting, Facebook, Instagram, or other online or offline media and social media.

7. The User is responsible for the proper conduct of its guests. User will provide up to two (2) security guards for the Event, and if Licensor believes additional security is required, Licensor will advise User including the cost thereof and obtain User's approval thereof before providing the same. All cost of such preapproved supplemental security is the responsibility of the User and at the User's expense. User will reimburse Licensor for any out of pocket and administrative fees it incurs due to a lack of proper security and event support/guest service staff.

8. .All décor' installation must have prior approval by Licensor. Open flames, fire, balloons, confetti, fog, animals and smoke machines, may not permitted and must be approved prior to use. Décor cannot be attached to walls, doors, ceilings, floors, or the train superstructure. We do not offer rigging points in any of the atria within the facility. All equipment must be freestanding and stable and designed by a licensed structural engineer and/or architect where required by law, and any decor, staging, rigging, bar, or toilet may not be placed on stairs or obstruct fire exits. User shall keep a minimum of two (2) fire extinguishers on site at all times if any open flames are used.

9. Licensor and its employees, agents, and/or partners shall have access to the Space at all times including during the Event upon reasonable prior notice to ensure compliance with this Agreement. Any such entry shall be conducted so as to not interrupt the Event and with reasonable care to all persons and property therein. The Licensor reserves the right to exclude or terminate any group or individual who is armed or otherwise presents a security risk or imminent danger to Union Pacific, Pullman Porter, Levar Hoard, Midcity Parking, City of Chicago, and the State of Illinois Dept of Transportation.

10. User must provide a Certificate of Insurance as evidence of general liability insurance with at least the following limits: $3,000,000 Combined Single Limit for Bodily Injury & Property Damage, and name Union Pacific, Pullman Porter, Levar Hoard, Midcity Parking, City of Chicago, and the State of Illinois Dept of Transportation as additional insureds.

11. In consideration of the privilege of using the B_Line and the Space, User hereby agrees to Hold Harmless Licensor and assume the risk for any injuries, including death, that may be sustained by Licensor, Union Pacific, and adjacent property owners or any person invited by User in connection with the User's use of the Space to the extent caused by User's or its invitees' negligence or willful misconduct. Further, User agrees to indemnify, hold harmless, assume liability for and defend Licensor, Union Pacific, adjacent property owners and their individual and collective officers, members and agents from all costs and expenses including, but not limited to, reasonable attorney's fees, reasonable investigative and discovery costs, court costs and any other sums (collectively "Claims")which Licensor, Union Pacific, adjacent property owners and their individual and collective officers, members and agents may pay or become obligated to pay for injury, including death, to persons or damage to property resulting from User's negligence or willful misconduct in connection with its use of said premises and Space

12. This Agreement shall not be assigned, conveyed, and/or sublet to any third party or entity without the prior, express written authorization of Licensor, even if agreed to by the Licensor, shall not release the User from the terms of the Agreement. User shall not make any additions, alterations, and/or improvements to the Space, of any kind without the written approval of the Licensor.

 

13.   User and Licensor each warrants and represents that:

(a) Licensor owns all rights, title and interest in the Space as defined in the Licensors M.U.R.A.L. Program Agreement created with the Union Pacific Railroad company.

(b) User has the full right and authority to enter into this Agreement;

(c) User shall pay for or sponsor a minimum of two murals for the B_Line project

Licensor and User each agrees to defend, indemnify and hold each other and their respective affiliates and their officers, directors, employees, agents and contractors ("Agency Indemnified Parties") harmless against any claims, losses, damages, fines, penalties, suits, actions, judgments, liabilities or expenses (including reasonable attorneys' fees) ("Claims") resulting from the breach or alleged breach by Licensor of any of the foregoing warranties and representations or of any other covenant, warranty or representation made by Licensor hereunder.

14. No Warranty for the fitness, appropriateness, legality of the User's event. In the event that any provision of this Agreement conflicts with the law under which this Agreement is to be construed or if any such provision isheld invalid by a court or tribunal of competent jurisdiction: (i) such provision shall be deemed to be restated to reflect as nearly as possible the original intentions of the Parties in accordance with applicable Laws; and, (ii) the remaining terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect. This Agreement shall not be subject to any rule of construction.

15. Neither party shall be considered in default in the performance of its obligations under this Agreement if such performance is prevented or delayed by any cause which is beyond the control of the Party affected, including but not limited to, war, hostilities, revolution, civil commotion, strike, lockout, epidemic, fire, wind or flood, excessive rain, traffic accident, or because of any law, order, proclamation, ruling, regulation or ordinance of any government or subdivision of government or because of any act of God ("Force Majeure Event").In the event that the Event can not get access to the Space on the dates herein provided by reason of a Force Majeure Event, the parties shall mutually agree on new dates for the Event. If the Event can not be

16. This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois, without giving effect to the conflict of law principles thereof. All disputes related to this Agreement shall be submitted to the exclusive jurisdiction and venue of a state or federal court located in Chicago, Illinois, which the Parties agree is the most appropriate and convenient venue for the resolution of disputes related to this Agreement.

17.   This agreement, together with any written and signed addenda hereto, constitutes the entire Agreement between the parties. Any changes or modification must be in writing and signed by the parties. This Agreement shall be binding upon the parties, heirs, administrators, executors, and successors and assigns. Any provision in this agreement found to be invalid or in violation of any statute, rule, regulation or common law shall be considered null and void, with the remaining valid and in effect. Each Party hereby certifies that the person signing on its behalf has the authority to sign this agreement for the organization or interests identified as Parties to this Agreement.

IN WITNESS WHEREOF, the Parties have executed this Agreement on the day first written above.

USER:SUPER LEGIT, LLC                                     LICENSOR: PULLMAN PORTER, LLC

*Andrew Luhring*                                          _____

Authorized Representative or Agent                        Authorized Representative or Agent

Managing Member / President Super Legit LLC               Managing Director

Printed Name                                              Printed Name

Andrew Luhring                                            Levar Hoard

# **EXHIBIT 2**

**Loard Hevar** is with Delwyn Harris.

5 hrs · 👥

Andrew Luhring AKA "Ru" AKA Super Legit (lol) dared to post some shit like this when this motherfucker—with all his mental ass issues—attempted to come for me when I launched his motherfucking new "career" and "project" on my watch and my dime. The motherfucking nerve of this asshole. You will only get called out in this fashion when you deserve it. And why did he do this you ask? Well, simply because I posted a video I have contractual rights to before he did and before he could take all the credit for the event lol. Ya, that petty. This asshole is fake and showed his fakeness when he called the cops on me randomly and told them false information and tried to convince them that I didn't have the rights to The B_Line and was some kinda "black bum" hustling folks for bus fare or squares—yea, it was that egregious and insulting. Simply for posting a video I have the rights to before he could post it and take all the credit. He went postal and created a whole elaborate, fake ass story to tell the cops. Right. Meanwhile the police commander of this district and sergeant know me well and I heard about this instantly. The lame ass story he told didn't have a snowballs chance in hell.

Bitch...I will eviscerate you publicly if you think you've earned the audacity to stunt on me in this fashion when all I ever did was try to help you with what I created and loaned to you. The same motherfucking pale-ass, sugar-daddy having ass, suburban ass, must-be-sucking-that-old-ass-dick-to-get-that-money punk that took alllll the credit for the event I hand-delivered to him (that wouldn't have happened at all without my production effort and investment and network and project) dared to do that petty shit to me. Now see, this is why I have trust issues.

I am livid. Not because I was challenged without a proper warrant—I fucking welcome all challengers—but don't you dare be a punk ass bitch like this motherfucker. It will be game over for you hun—I've had it with Chicago's lame midwestern energy that seems to manifest itself like this from time to time—particularly with repressed, entitled white homos like this cocksucker. Hunny, I'll leave you with your pancreas on the concrete...and enjoy the process of displaying what I've earned after forty one years on this earth. You fucking pissant. Do not ever deal with this asshole. If you've come to understand my taste level and mission, this is a no-brainer.

Long story short, my narrative and my career is backed up by stacks of paperwork and decades of face-to-face relationships that have survived strenuous tests. No one—false narrative or not—can touch me and what I own. His attempt failed, yet caused me to divert energy to respond to his false and vindictive narrative rooted in his mental issues. For that he won't get a second chance with me ever. But he most certainly will get my response and be dragged into the daylight from the deep shadows of his petty ass personality. Don't fuck with your elders son. Or do, and prepare for the consequences... 😤💅🏽 #fuckandrewluhring

Long story short, my narrative and my career is backed up by stacks of paperwork and decades of face-to-face relationships that have survived strenuous tests. No one—false narrative or not—can touch me and what I own. His attempt failed, yet caused me to divert energy to respond to his false and vindictive narrative rooted in his mental issues. For that he won't get a second chance with me ever. But he most certainly will get my response and be dragged into the daylight from the deep shadows of his petty ass personality. Don't fuck with your elders son. Or do, and prepare for the consequences... 😤💅 #fuckandrewluhring

---

 **Super Legit**
Yesterday at 4:02 PM · 🌐                                        •••

As Mental Health Awareness Month comes to an end, **Super Legit** would like to ask you to continue to be mindful of your friends, families and all the musicians and industry leaders out there that struggle with their mental health. Don't be afraid to reach out and ask questions. We are here for you, as well as these 7 mindful mental wellness organizations!



😮👍❤️ Darryl Kirk, Eric David and 7 others          36 Comments  1 Share

👍 Like            💬 Comment            ↪ Share

 **Nitzy Perez** I've heard such similar stories. I'm sorry you had to deal with this... wait. I mean, I'm sorry he has to deal with your wrath! That's some straight up craziness right their love.

Like · Reply · 5h                                               1

👍 Like   💬 Comment   ↪ Share

**Nitzy Perez** I've heard such similar stories. I'm sorry you had to deal with this... wait. I mean, I'm sorry he has to deal with your wrath! That's some straight up craziness right their love.

Like · Reply · 5h                                          👍 1

**Loard Hevar** I have no time for it and he will own the consequences. 😔

Like · Reply · 5h

**Loard Hevar** His pussy stank—he catfishing 🤷🏽‍♂️

Like · Reply · 4h                                          😆 1

Write a reply...                          😊 📷 GIF 🎟️

**Loard Hevar**
https://www.facebook.com/tony.casillas.98/videos/2262013617182797/

Don't owe nobody—nobody... See More

Like · Reply · 4h · Edited                                😆 1

**Eric David**
😳 🤦🏽‍♂️

Like · Reply · 4h

**Loard Hevar**



Like · Reply · 4h                                          😆 1

**Eric David** Loard Hevar 😫😂

Like · Reply · 4h

**Loard Hevar** summon the nigger in me—I dare anyone. But I don't use guns, I use this deadly brain. 🤭💅🏽

Like · Reply · 4h                                          👍 1

Write a reply...                          😊 📷 GIF 🎟️

**Eric David** Loard Hevar 😅 😂

Like · Reply · 4h

**Loard Hevar** summon the nigger in me—I dare anyone. But I don't use guns, I use this deadly brain. 🤫💅

Like · Reply · 4h  👍 1

Write a reply...

**RJ Pickens** What a shame, I'm pretty disappointed to hear this. 👎

Like · Reply · 3h  👍 1

**Andrew Luhring** RJ Pickens there's two sides to every story, please read mine if/when we release it.

Like · Reply · 32m · Edited

**Loard Hevar** Andrew Luhring please send it to me by all means since you didn't bother to before starting this shit lol

Like · Reply · 20m

**Loard Hevar** I'm curious myself

Like · Reply · 20m

**Loard Hevar** or feel free to post your lame ass "side" of the story because you most certainly didn't bother to tell me before you started all this lol

Like · Reply · 15m

**Loard Hevar** there's no way in hell I would even bother if you didn't deserve this

Like · Reply · 14m

**Andrew Luhring** Well... stay tuned for our response. That's all I have to say about it for now.

Like · Reply · 9m

**Loard Hevar** Andrew Luhring say it here asshole. You're continuing to piss me off.

Like · Reply · 8m

Write a reply...

**Javier Briseno** Damn, smh. Well that's a pretty shitty thing to do. Kids these days.

Like · Reply · 3h  👍 1



**Javier Briseno** Damn, smh. Well that's a pretty shitty thing to do. Kids these days.

Like · Reply · 3h 👍 1

**Danny Gerhardt** He looks like he might need some help to . Picture looks like he drank the kool aid and the mother ship Is about to fly over ha ha

Like · Reply · 2h 👍 1

**Markham Jenkins** Call up base!!

Like · Reply · 2h 👍 2

**Delwyn Harris** Dude haha what on earth is this tirade are you on drugs

Like · Reply · 1h

  **Loard Hevar** No, it's the truth

  Like · Reply · 20m

Write a reply...

**Delwyn Harris** Literally everything in this post is made up haha and why tag me and Seb what are you doing man

**Like** · Reply · 1h 👍 1

  **Loard Hevar** Not true at allllll ···

  Like · Reply · 20m

  **Loard Hevar** Where the lie???

  Like · Reply · 19m

  **Loard Hevar** Try to point one out. We're all waiting. And you brought this asshole to me so yes you're in the conversation.

  Like · Reply · 18m

Write a reply...

**Lucas J Pearson** Yikes! GoodTeam still coo tho yah? Lolz

Like · Reply · 54m

  **Loard Hevar** Yes very much so

  Like · Reply · 19m

 **Lucas J Pearson** Yikes! GoodTeam still coo tho yah? Lolz

Like · Reply · 54m

 **Loard Hevar** Yes very much so

Like · Reply · 19m

 **Lucas J Pearson**



Like · Reply · 12m                           1

 **Loard Hevar** Lucas J Pearson you should see the pathetic text messages this asshole sent me. I am livid. 🤧

Like · Reply · 9m

 **Andrew Luhring** Loard Hevar i havent sent you any text messages today.

Like · Reply · 8m

 **Loard Hevar** Andrew Luhring Not talking about today. 🙄

Like · Reply · 8m

 **Loard Hevar** If you think you can cause all this bullshit and bring me all this drama, you're sorely mistaken. I will defend what I created and loaned to you.

Like · Reply · 6m

 **Lucas J Pearson**



Like · Reply · 6m

 **Lucas J Pearson**



Like · Reply · 6m

 **Loard Hevar** Andrew Luhring I'm waiting, and have been waiting to hear a coherent version of why you would do all this and bring me this drama. Until you can explain yourself to me, which you never have. I will warn my friends to stay away from you hunny.

Like · Reply · 3m

 **Loard Hevar** Andrew Luhring and since this started because I posted the video sent to me, be sure to review your fucking contract with me bruh. That will govern my actions as it should yours before your young, inexperienced ass think you're going to fuck me.

Like · Reply · 1m

 Write a reply...   

 **Morgan McMeel** Damn.

Like · Reply · 39m

 **Loard Hevar** Yup...

Like · Reply · 19m

 Write a reply...   

 Write a comment...   

# EXHIBIT 3

Certificate of Registration





This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Kay H. Lisle*

United States Register of Copyrights and Director

**Registration Number**

## PA 2-192-440

**Effective Date of Registration:**
August 05, 2019

---

## Title

**Title of Work:** A Super Legit Black Market Recap

## Completion/Publication

**Year of Completion:** 2019
**Date of 1st Publication:** May 30, 2019
**Nation of 1st Publication:** United States

## Author

- **Author:** Super Legit, LLC
  **Author Created:** entire motion picture
  **Work made for hire:** Yes
  **Citizen of:** United States

## Copyright Claimant

**Copyright Claimant:** Super Legit, LLC
1334 W Wolfram St, Coach House / R, Chicago, IL, 60657

## Limitation of copyright claim

**Material excluded from this claim:** preexisting music

**New material included in claim:** all other cinematographic material, production as a motion picture

## Rights and Permissions

**Organization Name:** Richards Patent Law P.C.
**Address:** 20 N. Clark, Suite 3300
Chicago, IL 60602 United States

## Certification

**Name:** Trevor Martin

**Date**: August 05, 2019
**Applicant's Tracking Number**: 2045-001

**Correspondence:** Yes